IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

FEB 2 3 2007

U.S. DISTRICT COURT
CLARKSBURG, WV 2630

KRYSTAL K. PARRY,
    Plaintiff,

v.

             Civil Action No. 2:06CV30
             (Judge Maxwell)

LINDA S. McMAHON,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"),

42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for

Summary Judgment or, in the Alternative, Motion for Remand for Consideration of New and

Material Evidence and Defendant's Motion for Summary Judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Krystal K. Parry ("Plaintiff") filed an application for DIB on February 13, 2004, alleging

disability beginning December 29, 2003, due to a degenerated disc in cervical spine, two herniated

disks in the lumbar spine, severe pain in the lower back, buttocks, neck, shoulder, left arm and hand,

numbness in left arm and index finger, high blood pressure, post-carpal tunnel surgery, and asthma

---

[1] Linda S. McMahon became the Acting Commissioner of Social Security, effective
January 22, 2007, to succeed Jo Anne B. Barnhart. Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C.
§ 405(g), Linda S. McMahon is automatically substituted as the defendant in this action.

(R. 49, 64). The claim was denied at the initial and reconsideration levels and a hearing was timely requested (R. 27, 28, 36, 39). Administrative Law Judge Donald T. McDougall ("ALJ") held a hearing on May 13, 2005 (R. 308). Claimant, represented by a non-attorney benefits representative, appeared and testified, as did her husband David Parry, and Vocational Expert James Ganoe ("VE"). The ALJ issued a decision denying benefits on August 27, 2005 (R. 21). On January 13, 2006, the Appeals Council denied Plaintiff's request for review (R. 5), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Krystal K. Parry ("Plaintiff") was born on November 28, 1960, and was 44 years old at the time of the ALJ's decision (R. 21, 49). She graduated from high school, and received college credits for classes she took at work in food management (R. 313). She passed a food industry examination and is a Certified Food Management Professional (R. 97, 100). She has past work experience as a food service manager, pharmacy office assistant, and foster parent (R. 65). She last worked as a food service manager in February 2004 (R. 65). Plaintiff's earnings record indicates she acquired sufficient quarters of coverage to remain insured through March 31, 2005 (R. 15). She therefore must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. See 42 U.S.C. §423(a), (c).

On October 15, 1999, Plaintiff presented to Mountainstate Orthopedic Associates with a several year history of bilateral carpal tunnel syndrome as well as cubital tunnel syndrome (R. 150). Upon physical examination, Spurling's test was negative, thoracic outlet syndrome test was negative, she had a positive Tinel's sign, positive elbow flexion test, no atrophy, normal Allen's test, negative tests for pronator syndrome, and positive Phalen's test. She had mild thenar weakness but no

atrophy and no significant signs of arthrosis. The diagnosis was bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome. Plaintiff was to treat the cubital tunnel syndrome conservatively, but elected to have carpal tunnel release surgery on both wrists.

On November 19, 1999, Plaintiff reported all symptoms were gone in both hands following her carpal tunnel surgery (R. 150). She was already back working at her regular job. She had no intrinsic atrophy or weakness.

On January 21, 2000, Plaintiff's carpal tunnel symptoms were gone, but she had "a vague aching in the left arm . . . . from the neck all the way down across the shoulder and sometimes in the dorsal aspect of the forearm" (R. 149). She had this during the day when she sat at the computer "for a long time," and a lot at night. She had intermittent tingling and numbness "vaguely" in the left hand.

Examination showed no symptoms of carpal tunnel syndrome. Cubital tunnel symptoms were minimal. Elbow and wrist examination were benign. The shoulder showed "a little bit of discomfort on full forward flexion or abduction passed [sic] 100 degrees but not really much in the way of impingement syndrome type symptoms." Spurling's test showed "a fair amount of discomfort in the paracervical muscles and superior aspect of the shoulder, but it doesn't radiate pain or tingling all the way down the arm." Motor and reflex exams were normal. The diagnosis was "a mild cervical root impingement." Plaintiff indicated her symptoms started right after she had an upper respiratory infection with a lot of coughing. She had pain when she coughed. The doctor noted Plaintiff was a smoker and advised her to limit smoking. He discussed diagnostic and treatment options, but Plaintiff preferred to start off "just with anti-inflammatory medication alone [and] declined an over-the door traction or pain clinic referral."

On May 17, 2001, Plaintiff's orthopedic specialist noted Plaintiff had a recent history for the past two months of "a vague type of pain first down the left shoulder and into the arm in a not specifically dermatomal fashion [and then] more in the right arm and shoulder" (R. 148). She denied any numbness, tingling or weakness. Examination was negative for carpal tunnel or cubital tunnel syndrome. Shoulder exam was "completely benign" with good range of motion, no instability, no weakness, no atrophy, no impingement, and no winging. Her cervical spine showed good motion with "some generalized discomfort in the posterior neck and upper thoracic area" upon extension, and a burning type pain from the neck down the posterior aspect of right arm into the forearm with extension and right or left lateral rotation. The doctor opined: "I think she still has a mild degree of cervical root entrapment." He told her she needed to quit smoking. He suggested an MRI, but Plaintiff preferred "not to spend that kind of money right now." Instead, she was going to use Lorcet and an over-the-door cervical traction unit.

On June 14, 2001, Plaintiff reported more pain in her left arm, from her neck all the way down her arm, including some numbness and tingling, but not specifically dermatomal (R. 147). Her previous symptoms had been on the right, and had somewhat decreased. Cervical traction had not helped. The doctor noted that Plaintiff continued to smoke. Examination showed "dramatically positive Spurling's test on the left today." There were no focal motor or reflex deficits in the upper extremities. Testing for thoracic outlet syndrome was equivocal. Plaintiff elected to go ahead with a cervical MRI to rule out herniated disk.

On June 26, 2001, Plaintiff's husband telephoned the doctor stating that Plaintiff was "really miserable" with neck pain and was scheduled for an MRI that week (R. 147). She was not having any numbness or tingling, but was having some chest pain which the doctor opined was related to

4

her shoulder.

An MRI of the cervical spine on June 28, 2001, showed mild degenerative disc changes at C6-7 with associated small disc protrusion lateralizing to the left with mild left neural foraminal encroachment, but no spinal canal stenosis or focal disc herniation (R. 151).

On July 5, 2001, Plaintiff's orthopedic specialist noted her MRI showed a disc protrusion lateralizing to the left at the C6-7 level (R. 147). He opined this correlated with her neurologic symptoms, although he could not be sure this was the cause. Examination that day showed decreased sensation in the index finger, but no focal, motor or reflex deficits. She had a positive Spurling's test, limited range of motion in the neck, and continued to smoke but was trying to quit. Plaintiff told the doctor that the pain was extreme and she could not continue with only conservative treatment. She chose to proceed with a cervical epidural injection series in lieu of surgery, and the doctor referred her to the Pain Clinic.

On July 26, 2001, Plaintiff presented to the pain clinic for evaluation and treatment by Gregg Weidner, M.D. (R. 155). Upon examination Plaintiff had good forward flexion, good hyperextension, no problems with lateral rotation or side bending, 3+ reflexes, intact sensation to pinprick, and good strength in the upper extremities. Gait was normal and lungs were clear. Dr. Weidner performed an intralaminar epidural steroid injection at C6-7.

On August 8, 2001, Dr. Weidner wrote to Dr. Bonaroti, a neurosurgeon, opining that Plaintiff's epidural steroid injection had gone "quite well" and "improved a great deal of her radicular component to her pain" (R. 154). She was "seeing marked improvement in her symptoms" (R. 153). Whereas prior to the procedure she had been taking Vicodin "on a frequent basis," she was now able to stop that medication. She was having a "little bit of problem with withdrawal

symptoms, but, otherwise, [was] doing well." Plaintiff and her husband requested an evaluation by a neurosurgeon, and Dr. Weidner referred them to Dr. Bonaroti.

On August 22, 2001, Dr. Bonaroti examined Plaintiff (R. 157). He noted Plaintiff had had significant relief from her two epidural injections. She currently had some minor neck ache and some numbness in her index finger, although the numbness also improved after the injection. She denied any weakness, and had no gait disturbance. She reported a transient episode that involved the right arm but her symptoms were predominantly on the left side.

Upon examination, Plaintiff had full range of motion of her cervical spine but developed neck pain with both extension and flexion. Spurling's test was negative, she had no Lhermitte's sign, motor strength was 5/5 throughout, and reflexes were 2+ and symmetric except for the left biceps which was diminished. Sensation was intact to light touch and pinprick.

Dr. Bonaroti opined that the June 29, 2001, MRI showed "perhaps a very small disc protrusion at C6-7 to the left." He also opined that there was degenerative disease at that level, but "otherwise, the MRI scan was unremarkable." He would not recommend any more aggressive intervention because Plaintiff had responded quite well to the injections, and he believed she had a good chance of having good long-term control "given the unimpressive nature of her MRI findings."

On October 17, 2001, Plaintiff presented as a new patient to Susaina Khurana, M.D., for complaints of high blood pressure (R. 236). Plaintiff reported she no longer had any neck pain and was currently not on any medications. Plaintiff reported shortness of breath on walking up three flights of stairs; swollen ankles over the past week with pain when tired; increased cold sensitivity in hands and feet; history of dyspnea on exertion, worse in the past year; and increased snoring episodes. She denied any back or extremity pain. The diagnosis was hypertension, elevated blood pressure on more than three occasions, new onset; nicotine addiction; and rule out sleep apnea. She

6

was scheduled for an echocardiogram.

An October 30, 2001, chest x-ray for "shortness of breath" indicated hyperexpansion of the lungs but no other focal or acute process (R. 251). There was an "incidental note of mild degenerative disc disease in the lower thoracic spine."

An echocardiograph performed on November 14, 2001, indicated normal left ventricular systolic function grossly, but it was noted to be a technically difficult study in which the structures were not well visualized (R. 250).

Plaintiff reviewed her echocardiogram with Dr. Khurana on November 28, 2001 (R. 233). It was considered to be within normal limits. Plaintiff reported improvement in her dyspnea on exertion since her blood pressure had normalized. She was down to three or four cigarettes a day, and denied any chest pain or shortness of breath. She was diagnosed with hypertension, nicotine addiction, and sleep apnea.

A March 27, 2002, MRI of the cervical spine showed degenerative disc disease at the C6-7 level with mild posterior osteophytosis and possibly some mild left sided C6-7 uncovertebral osteophytosis (R. 152). "Only mild to moderate exiting foraminal encroachment [was] seen." No herniated disc was seen.

On March 20, 2002, Dr. Bonaroti wrote to Dr. Weidner that Plaintiff had had about four months of relief with epidural injections, but in early March "developed recurrent pain with radiation into the left arm" (R. 156). On examination, Plaintiff had a positive Spurling's test with rotation to the right. Motor testing was 5/5 and sensation was intact. Dr. Bonaroti opined that Plaintiff had had a worsening of her cervical radiculopathy. He recommended a repeat MRI.

In September 2002, Plaintiff presented to the emergency room with complaints of low back

pain for the past two weeks (R. 160). She reported she got up from sitting at the computer for two hours and felt low back pain at that time. The pain had been there since, but on this day her back had "seized up" when she got out of bed and she was in severe pain. She was diagnosed with lumbosacral muscle spasm and prescribed Percocet, Ibuprofen, and Flexeril.

An October 12, 2002, lumbar spine MRI showed a large central herniation at the L4-5 level and a small herniation at the T12-L1 level on the left, as well as vertebral body endplate irregularities in the lower thoracic and upper lumbar region (R. 249).

Plaintiff followed up with Dr. Khurana on February 12, 2003 for her hypertension (R. 232). She was back up to 1½ packs of cigarettes per day. She denied any other complaints. She was diagnosed with hypertension and tobacco addiction and prescribed nicotine patches.

On February 26, 2003, Plaintiff was evaluated by neurologist Joseph Voelker, M.D. (R. 230). Plaintiff reported a history of neck and back pain as well as left arm pain and numbness, but had no specific complaint that day. She reported improvement in her pain after three epidurals, but continued to experience mild paresthesias in the second and third digits as well as the anterior forearm. This symptom had been constant but had not worsened, and Plaintiff had not noticed any upper extremity weakness. Plaintiff reported her lower back pain began six months earlier. She experienced bilateral leg pain, but this had resolved after several months and she had not been experiencing any significant low back pain or lower extremity pain. She reported mild neck aching and mild aching back pain with prolonged sitting or lifting.

Dr. Voelker diagnosed Plaintiff with herniated disc, L5, right central asymptomatic, and disc bulge C6-7 (R. 231). He felt she should undergo conservative treatment "since she is not experiencing any symptoms from her lumbar herniated disc and she is experiencing mild upper

8

extremity symptoms which have been improving." He explained that the symptoms may wax and wane, but did not recommend surgery because Plaintiff was not experiencing enough disability or discomfort to warrant surgery. She also did not want surgery. Dr. Voelker suggested a one-time evaluation by a physical therapist for home instruction on exercises to strengthen the cervical and lumbar muscles, hopefully to prevent any worsening of symptoms.

Plaintiff presented to George Frederick, M.D. on December 29, 2003, for complaints of cough and back pain (R. 229). The coughing had been continuing for approximately one month, and she had had a coughing spell that caused her to throw her back out. Plaintiff was diagnosed with bronchitis, asthma, and herniated lumbosacral disk. Dr. Frederick decided to treat her conservatively, advised her to quit smoking, and gave her an excuse from work until January 9, 2004.

One week later, on January 6, 2004, Plaintiff was feeling a lot better, with less coughing (R. 228). She was completely off cigarettes. Her back pain was much improved and she felt a lot better. Dr. Frederick gave Plaintiff some instructions on cigarette cessation and proper lifting and care of her back, as well as some low back exercises. Dr. Frederick diagnosed asthma much improved, herniated lumbosacral disk much improved and mild hypertension.

Two weeks later, Plaintiff was "doing fairly well" (R. 227). She had started working full-time, and her back had started aggravating her, however. She also started having a lot more neck pain. She stated she usually did fine "until she goes back to full-time work and then it starts aggravating her." Upon examination, Plaintiff had some back tenderness over the lumbosacral region and positive straight-leg raising bilaterally. Dr. Frederick recommended a new MRI and set up an appointment with Dr. Voelker. Plaintiff "did not want to take any medications at this time,

so [Dr. Frederick] gave her an excuse to decrease her work to part-time to see if this will help a little bit."

On April 6, 2004, Plaintiff presented to Christine Bruno, M.D., with complaints of cough, congestion and rhinorrhea for two days (R. 226). She also felt a lot of fatigue. She had been trying to quit smoking, but had not been successful. Her son was sick as well. Dr. Bruno diagnosed sinusitis.

On April 7, 2004, State agency reviewing physician Fulvio Franyutti, M.D. completed a physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 164). He opined she would have no postural, visual, environmental, or communicative limitations, but would have a limitation on "feeling." Dr. Franyutti opined that Plaintiff could work at the medium exertional level.

On May 24, 2004, Plaintiff presented to Mary Ann Long, M.D. for a checkup (R. 224). She had no concerns or complaints. Her past medical history was positive for some possible asthma, some hypertension, and some chronic back pain. The doctor diagnosed asthma, possible COPD, and hypertension, currently well controlled, and "strongly encouraged smoking cessation."

On August 3, 2004, State agency reviewing physician Thomas Lauderman, D.O. completed an RFC, also opining Plaintiff could work at the medium exertional level (R. 175).

On August 10, 2004, Plaintiff presented to C.H. Mitch Jacques, M.D. for back pain mostly in the back of her neck down into her shoulders (R. 223). While it was usually her left hand that was "kind of numb and stingy," recently her right hand had been numb or "just feels funny." She had no loss of grip or strength. She noted that she had more pain "whenever she does a lot of heavy work

10

at home." Upon examination, Plaintiff's neck range of motion was "somewhat limited" secondary to pain. Trapezius and rhomboid muscles were extremely tense. She had a good grip, her reflexes were intact, and she had no motor or sensory deficits. Dr. Jacques diagnosed cervical neck strain and tobacco use.

On August 21, 2004, State agency reviewing psychologist James Capage, Ph.D. completed a Psychiatric Review Technique ("PRT") opining that Plaintiff had no medically determinable mental impairment (R. 178).

On September 13, 2004, Plaintiff returned to Dr. Jacques with complaints of chronic back pain (R. 222). Upon examination, Plaintiff's gait was intact. She had "somewhat limited" range of motion of the cervical spine, tenderness of the thoracic paraspinous muscles, and tenderness over the lumbosacral spine. She did not want to be on drugs because they interfered with her work, "as well as taking care of her family." She was making an effort to find a new job.

A September 20, 2004, thoracic spine MRI indicated a mild wedge shape to the T11 vertebral body, unchanged from October 2001, and mild degenerative disk disease at the T10-11 and T11-12 levels without significant neural foraminal or central canal stenosis (R. 244, 271).

A cervical spine MRI performed that same date showed a mass in the parapharyngeal space and mild degenerative changes of the lower cervical spine (R. 242).

Plaintiff presented to Dr. Frederick on November 17, 2004, for followup of her "multiple medical problems" (R. 220). She reported some shortness of breath getting progressively worse. She had shortness of breath whenever she exerted herself, including going up steps or walking across a parking lot. She continued to smoke. She was also concerned about weakness and fatigue in her upper extremities. Dr. Frederick noted Plaintiff was "obsessed with this thoracic outlet syndrome

and thinks that may be the cause." Plaintiff's straight-leg raising was negative, although she did have some tenderness and some muscle spasm up along the thoracic spine on the right paraspinal muscles. Her lungs were totally normal.

Dr. Frederick diagnosed shortness of breath, possibly secondary to asthma or mild COPD; back pain, chronic, probably secondary to degenerative disc disease; lower back pain, probably secondary to spinal stenosis; left arm numbness; previous C-spine abnormality; and hypertension. He advised an EMG/nerve conduction study of the left arm.

A November 17, 2004, chest x-ray showed no definite active lung process or gross interval change since the previous study, and hyperinflation unchanged since the previous study (R. 240).

On November 19, 2004, Plaintiff had a fine needle biopsy performed of a parapharyngeal mass that had been present for several years (R. 192, 211). It had been found incidentally on a scan. There was no evidence of malignancy, and the mass was considered "most consistent with right parapharyngeal space pleomorphic adenoma" (R. 209, 211). Surgery was discussed, and Plaintiff stated she would decide if she wished to proceed with surgery "further down the road."

Spirometry performed on November 22, 2004 showed severe obstructive ventilatory impairment, but with significant bronchodilator response (R. 259).

An EMG performed on November 22, 2004, for complaints of arm pain numbness was considered "normal" with "no evidence of left cervical radiculopathy" (R. 257).

On December 13, 2004, Plaintiff followed up with Dr. Frederick regarding her "multiple medical problems" (R. 219). She reported feeling much better, with less shortness of breath and less wheezing. She continued to report numbness and tingling in the hands, and "she and her husband are still convinced that she still has thoracic outlet syndrome." Dr. Frederick diagnosed asthma with

12

marked obstructive component; "some back pain" that appeared to be chronic in nature; and "possible" thoracic outlet syndrome. He referred her to vascular surgery for evaluation of possible thoracic outlet syndrome.

A January 12, 2005, chest x-ray indicated changes consistent with COPD (R. 253). The central pulmonary vascularity and cardiac silhouette were within normal limits, and there were no pleural effusions or focal infiltrates present.

Plaintiff presented to vascular surgeon Christian Schunn, M.D. for her suspicion of thoracic outlet syndrome (R. 281). Upon examination, Plaintiff's neck range of motion was essentially within normal limits at the end points on both sides. She had paraspinal and trapezius tenderness. Brachial plexus was nontender on the right. There was point tenderness at the base of the left neck. No radiating pain could be elicited with hyperabduction maneuvers. Dr. Schunn diagnosed soft tissue rheumatism vs. neuromuscular-type pain, but doubted thoracic outlet pathology.

On January 31, 2005, Dr. Schunn noted Plaintiff's cervical spine x-rays demonstrated degenerative joint disease and osteophyte formation at C6-7 without instability (R. 278). He noted her chest x-ray was normal and ASO titer and lupus antibodies were negative. Dr. Schunn advised conservative management. He prescribed physical therapy, and if that did not help, nonsteroidal anti-inflammatory drugs.

On February 7, 2005, Plaintiff presented to Dr. Frederick for follow up of her shortness of breath and high blood pressure (R. 302). Plaintiff reported she was doing well. She felt a little bit better, but still with some shortness of breath. She was still smoking. They discussed quitting, but she wanted to wait until the weather was "a little bit better when she can go out and walk and get away from everything." She and her husband were "planning to do this together." Dr. Frederick

13

noted Plaintiff's vascular workup was negative.

Upon examination, Plaintiff's lungs were clear. Her back had "some tenderness up and down the spine." Sensory and motor exam was normal. Dr. Frederick diagnosed asthma and depression. He gave her some samples of Lexapro to try to "see if this helps her with her irritability and moodiness."

Plaintiff's date last insured was March 31, 2005.

On April 11, 2005, Plaintiff reported a little more wheezing lately, since she had an upper respiratory infection "that flared everything up" (R. 301). She was doing a little better and felt pretty good, although her blood pressure had been slightly going up. Dr. Frederick diagnosed asthma and hypertension. He encouraged her to stop smoking. He also gave her a prescription for Lortab for "chronic neck pain."

On April 21, 2005, Plaintiff presented to Dr. Frederick for preadmission evaluation for her surgery on the parapharyngeal mass (R. 299). Her asthma was much better and she was doing fairly well. She was still smoking but "planning to quit in the beginning of May." Upon examination, Plaintiff's back had no tenderness on percussion. Dr. Frederick diagnosed asthma, stable, hypertension stable, and abnormal EKG.

At the administrative hearing held less than a month later, Plaintiff testified she quit her job at Subway because she "couldn't do it," testifying:

> The other employees were having to pick up my slack. I felt . . . when I work for someone, I put everything I have into it. And I don't want other people to feel sorry for me or for other people to have to pick up what I can't do.

(R. 317). She testified she could not do the work because of all the "lifting." "You have to rotate stock. You're standing continuously." Her back had been better right before she went to Subway,

but then "because it's so physical in food service, it started back." Plaintiff testified that she fumbled and dropped things due to numbness in her hand and arm. She was working two days a week at a pharmacy at the time of the hearing, and testified her boss was "very understanding." She felt she was "taking advantage of him," however.

When asked what made her back pain worse, Plaintiff testified:

Doing things. Just trying to - - the everyday things - - housecleaning - - that I used to be - - could do the house and then get outside and start the yard. And now, it takes me all day long just to do the house, and I have to take breaks. And even at work. By the time four hours at work comes up, I am in – I'm in pain. I'm - - I get shaky. I have to lean on the counter all the time. I have to - - and Wilbur [her boss] let - - well, he's always asking me, Kelly, do you need to sit down for a couple minutes? Do you need to, you know - - do you need to go lay down? You can go upstairs and even lay down if you need to. And I'm like, no. I'm okay. I'm all right. And I push myself . . . .

By the time I'm done with five, and then if I push it to six hours, I'm all - - I have to relax the rest of the day. So my husband and my son has had to pitch in, do half of my work at home.

(R. 322).

Plaintiff testified she tried to start getting some chores done at home soon after her husband went to work and son went to school. Around 11:00 she laid down for a couple of hours because she was "very tired and sleepy a lot." Then she would get back up and "do some more." Then, before her son came home from school, she would start supper and lie down again.

When asked if she did the cooking and cleaning, Plaintiff testified:

I do because I don't really have a choice. Dave and Craig help. They help out once in a while, when they're there, when I'm in a lot of pain. But I don't want them doing - - I've go to do it. I can't expect everyone around me to do everything for me.

(R. 324).

Plaintiff testified that the only thing she took for her pain was hydrocodone, but that she did

15

not take it much because it had been upsetting her stomach lately, and also because she was working at the pharmacy and it interfered with her concentration. So, she testified, "The only time I really take it is if I'm really in extreme pain, and then, half the time, it's making me nauseous."

Although her employer offered to allow her to lie down during the work day, she never accepted his offer, and testified "I will not."

### New Evidence Submitted to the Court

The ALJ held an Administrative Hearing on May 13, 2005 (R. 308). At the conclusion of the hearing, the ALJ agreed to leave the record open for Plaintiff to submit the results of a stress test and gallbladder test (R. 344). Plaintiff's representative believed the results would be available within a week or so (R. 311). The ALJ entered his Decision on August 27, 2005 (R. 21). Again, significantly, Plaintiff's date last insured was March 31, 2005.

Attached to Plaintiff's Motion for Summary Judgment are the following records:

- October 12, 2005    Plaintiff completed a "Patient History" stating that she had had a recent upper respiratory infection with cough with increased right upper extremity pain/numbness/tingling/weakness, with pain better with prednisone. The history also reported Plaintiff had had her gall bladder removed on June 15, 2005, and a deep parotid tumor removed July 13, 2005.

- October 13, 2005    Physical examination performed by Eugene Bonaroti, MD. When making the appointment, Plaintiff noted her reason for appointment was "cervical." Dr. Bonaroti found Plaintiff's mental status was normal, her cranial nerves were normal, her motor strength was

16

normal throughout, her tone was normal, her gait was normal, her sensation was decreased on the right C6 dermatone, reflexes were decreased, coordination was normal, straight leg raises were negative, and Patrick's sign was negative. Studies indicated she had herniated discs at L4-5, C5-6, and C6-7. Under "Diagnoses," the doctor checked "New Problem, No Workup."

- October 13, 2005    Letter from Dr. Bonaroti to Dr. Frederick, stating:

Krystal Parry returned to the office today for followup. I last saw her three years ago. At that time, she was being treated for symptomatic cervical disc disease. She underwent treatment with epidural injections and had some improvement. She has never had complete relief and had residual left arm pain and numbness. About three weeks ago, she developed the acute onset of right upper extremity pain and numbness in the C6 distribution. She has had partial improvement with oral steroids, but still is quite uncomfortable. In addition to her recurrent cervical complaints about six months after I last saw her, she developed low back pain with radiation down the left leg and numbness. She has no weakness. She has been dropping things with her right hand. She has no bowel or bladder complaints or gait disturbance.

On examination, she has no motor or reflex deficits. Sensation is decreased in her right C6 dermatome. Straight leg raising is negative.

I reviewed a recent lumbar and cervical MRI scan. There is a large L4-L5 disc herniation in the left with an extruded fragment. In the cervical spine, there are protrusions on the right at C5-C6 and on the left at C5-C6 and C6-C7.

My impression is that Ms. Parry is having worsening cervical radiculopathy due to cervical disc disease. She may also have a symptomatic lumbar disc herniation. In order to more carefully evaluate the possibility of cervical nerve root compression, I have recommended a myelogram and post-myelogram CT. I will see her back when that is complete and determine whether she is a surgical candidate. . . .

- December 2, 2005    Dr. Bonaroti wrote a letter to Dr. Frederick stating:

  > Krystal Parry returned to the office today for followup. She underwent a myelogram and postmyelogram-CT which I reviewed. Interestingly, her cervical complaints have subsided significantly and she now is complaining mostly of low back and leg pain. Her cervical myelogram does show bilateral foraminal stenosis at C5-C6 and C6-C7. She may have symptomatic cervical spondylosis but at this point, does not want to consider surgical intervention for her neck. She has had chronic back and leg pain related to her lumbar disc herniation. I reviewed her previous lumbar MRI scan and confirmed the presence of an L4-L5 disc herniation with a free fragment. I think she would benefit from a L4-L5 laminectomy and discectomy . . . .

- January 3, 2006    Plaintiff underwent a left L4-L5 microdiskectomy.

- February 2, 2006    Three weeks post surgery, Plaintiff complained of no significant reduction in her leg pain. Dr. Bonaroti opined this was not typical, but that Plaintiff may be slow to see improvement. She had positive straight leg raise. Motor testing was 5/5.

- February 12, 2006    MRI indicated large disk herniation increased since the October 9, examination, causing severe spinal stenosis and severe attenuation and displacement of the thecal sac on the left side with severe compression of the left L5 and L6 nerve roots. The reviewer opined: "This has progressed since the previous examination from October of 2005."

- February 16, 2006    Dr. Bonaroti informed Dr. Frederick that Plaintiff had had an early disc recurrence after her microsurgical discectomy. She was scheduled for another surgery.

- February 20, 2006    Plaintiff underwent repeat diskectomy.

| • | March 20, 2006 | Plaintiff reported the acute lumbar radiculopathy had subsided. She was having "some intermittent mild radiating pain along with some tingling and some easy fatigability." Examination showed mildly positive straight leg raise on the left at about 80 degrees, and some mild left EHL weakness at 4.5/5. Otherwise she was intact and had begun to increase her activity level. She was tolerating her activities of daily living, but seemed to fatigue relatively soon. She was instructed to increase her activity level as tolerated, and plan on a part-time return to work on March 9, 2006, with a lifting restriction. |

## III.  Administrative Law Judge Decision

The ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(I) of the Social Security Act through March 31, 2005.

2.  The claimant has not engaged in substantial gainful activity since December 29, 2003 (20 CFR §404.1520(b).

3.  The claimant has the following severe combination of impairments: parotid gland tumor; asthma; status post carpal tunnel surgery; degenerative joint disease and osteophyte formation of the cervical spine; and low back pain (20 CFR § 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520(d)).

5.  Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with a sit/stand option and no exposure to extremes of fumes, dusts, gases, or other respiratory irritants.

6.  The claimant is unable to perform any past relevant work (20 CFR §

404.1565).

7.  The claimant was born on November 28, 1960 and was 43 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR § 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR § 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §§ 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 29, 2003 through the date of this decision (20 CFR § 404.1520(g)).

(R. 20, 21).

## IV. Contentions

Plaintiff contends:

A.  The Administrative Law Judge's conclusion that Mrs. Parry's symptoms were not credible is not supported by substantial evidence;

B.  The ALJ did not properly apply Social Security 96-7p regarding the type of medication she was taking for relief of pain and other measures she used, such as lying down three to four hours per day to relieve pain; and

C.  This matter should be remanded for the Commissioner to consider new and material evidence pursuant to the sixth sentence of 42 U.S.C. § 405(g).

Defendant contends:

A.  The record shows that Plaintiff was not fully credible; and

B.  Evidence submitted to this Court related to a different time period

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Credibility

Plaintiff first argues the Administrative Law Judge's conclusion that her symptoms were not credible is not supported by substantial evidence. Defendant contends the record shows that Defendant was not fully credible.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v.

<u>Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

<u>Craig</u>, <u>supra</u> at 594.

Here the ALJ found that Plaintiff had "the following severe combination of impairments: parotid gland tumor; asthma; status post carpal tunnel surgery; degenerative joint disease and osteophyte formation of the cervical spine; and low back pain . . . ." The ALJ then found that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," thus finding that Plaintiff met the first, threshold requirement of the analysis.

The undersigned finds substantial evidence in the record before the ALJ supports his

determination that Plaintiff was not entirely credible. On February 26, 2003 (10 months prior to her alleged onset date), Plaintiff told Dr. Voelker she had improvement of her neck pain after epidurals, and she had not noticed any upper extremity weakness. She reported back pain beginning six months earlier, but she had not been experiencing any significant low back pain or lower extremity pain, only mild neck aching and mild aching back pain with prolonged sitting or lifting. Dr. Voelker found that Plaintiff had a herniated lumbar disc, but that it was asymptomatic. She did not want surgery, and the doctor opined she was "not experiencing enough disability or discomfort to warrant surgery." Dr. Voelker encouraged home exercise to strengthen the lumbar and cervical muscles.

In September 2003, Plaintiff stopped working in the pharmacy and went to work full time at a Subway restaurant.

Plaintiff next presented to a physician on December 29, 2003 (her alleged onset date) for cough and back pain. She had been coughing for a month, and a coughing spell caused her "to throw her back out." Her treating physician advised conservative treatment and excused her from work for two weeks.

On January 6, 2004, Plaintiff was feeling a lot better, with less coughing (R. 228). Her back pain was much improved and she felt a lot better. Dr. Frederick gave Plaintiff some instructions on cigarette cessation and proper lifting and care of her back, as well as some low back exercises. Dr. Frederick diagnosed asthma much improved, herniated lumbosacral disk much improved and mild hypertension.

Two weeks later, Plaintiff was "doing fairly well" (R. 227). She had started working full-time, and her back had started aggravating her, however. She also started having a lot more neck pain. She stated she usually did fine "until she goes back to full-time work and then it starts

aggravating her." Upon examination, Plaintiff had some back tenderness over the lumbosacral region and positive straight-leg raising bilaterally. Dr. Frederick recommended a new MRI and set up an appointment with Dr. Voelker. Plaintiff "did not want to take any medications at this time, so [Dr. Frederick] gave her an excuse to decrease her work to part-time to see if this will help a little bit." (Emphasis added).

On May 24, 2004, Plaintiff presented to Mary Ann Long, M.D. for a checkup (R. 224). She had no concerns or complaints. Her past medical history was positive for some possible asthma, some hypertension, and some chronic back pain.

On August 10, 2004, Plaintiff presented to C.H. Mitch Jacques, M.D. for back pain (R. 223). The pain was mostly in the back of her neck down into her shoulders. While it was usually her left hand that was "kind of numb and stingy," recently her right hand had been numb or "just feels funny." She had no loss of grip or strength. She noted that she had "more back pain whenever she does a lot of heavy work at home." Upon examination, Plaintiff's neck range of motion was "somewhat limited" secondary to pain. Trapezius and rhomboid muscles were extremely tense. She had a good grip, her reflexes were intact, and she had no motor or sensory deficits. Dr. Jacques diagnosed cervical neck strain and tobacco use. (Emphasis added).

On September 13, 2004, Plaintiff returned to Dr. Jacques with complaints of chronic back pain (R. 222). Upon examination, Plaintiff's gait was intact. She had "somewhat limited" range of motion of the cervical spine, tenderness of the thoracic paraspinous muscles, and tenderness over the lumbosacral spine. She did not want to be on drugs because they interfered with her work, "as well as taking care of her family." She was making an effort to find a new job.

A September 20, 2004, thoracic spine MRI indicated a mild wedge shape to the T11 vertebral

24

body, unchanged from October 2001, and mild degenerative disk disease at the T10-11 and T11-12 levels without significant neural foraminal or central canal stenosis (R. 244, 271).

A cervical spine MRI performed that same date showed a mass in the parapharyngeal space and mild degenerative changes of the lower cervical spine (R. 242).

Plaintiff presented to Dr. Frederick on November 17, 2004, for followup of her "multiple medical problems" (R. 220). She reported some shortness of breath getting progressively worse. She had shortness of breath whenever she exerted herself, including going up steps or walking across a parking lot. She continued to smoke. She was also concerned about weakness and fatigue in her upper extremities. Dr. Frederick noted Plaintiff was "obsessed with this thoracic outlet syndrome and thinks that may be the cause." Plaintiff's straight-leg raising was negative, although she did have some tenderness and some muscle spasm up along the thoracic spine on the right paraspinal muscles.

Dr. Frederick diagnosed shortness of breath, possibly secondary to asthma or mild COPD; back pain, chronic, probably secondary to degenerative disc disease; lower back pain, probably secondary to spinal stenosis; left arm numbness; previous C-spine abnormality; and hypertension.

An EMG performed on November 22, 2004, for complaints of arm pain numbness was considered "normal" with "no evidence of left cervical radiculopathy" (R. 257).

On December 13, 2004, Plaintiff followed up with Dr. Frederick regarding her "multiple medical problems" (R. 219). She continued to report numbness and tingling in the hands, and "she and her husband are still convinced that she still has thoracic outlet syndrome." Dr. Frederick diagnosed "some back pain" that appeared to be chronic in nature; and "possible" thoracic outlet syndrome.

25

Vascular surgeon Christian Schunn, M.D. examined Plaintiff, finding Plaintiff's neck range of motion was essentially within normal limits at the end points on both sides. She had paraspinal and trapezius tenderness. Brachial plexus was nontender on the right. There was point tenderness at the base of the left neck. No radiating pain could be elicited with hyperabduction maneuvers. Dr. Schunn diagnosed soft tissue rheumatism vs. neuromuscular-type pain, but doubted thoracic outlet pathology. Her cervical spine x-rays demonstrated degenerative joint disease and osteophyte formation at C6-7 without instability (R. 278). Chest x-ray was normal and ASO titer and lupus antibodies were negative. Dr. Schunn advised only conservative management. He prescribed only physical therapy, and if that did not help, only nonsteroidal anti-inflammatory drugs.

On February 7, 2005, Plaintiff presented to Dr. Frederick for follow up of her shortness of breath and high blood pressure (R. 302). Plaintiff reported she was doing well. She felt a little bit better, but still with some shortness of breath. She was still smoking. They discussed quitting, but she wanted to wait until the weather was "a little bit better when she can go out and walk and get away from everything." She and her husband were "planning to do this together." Upon examination, Plaintiff's back had "some tenderness up and down the spine." Sensory and motor exam was normal. Dr. Frederick diagnosed asthma and depression and gave her some samples of Lexapro to try to "see if this helps her with her irritability and moodiness."

Plaintiff's date last insured was March 31, 2005.

On April 11, 2005, Plaintiff reported a little more wheezing lately, since she had an upper respiratory infection "that flared everything up" (R. 301). She was doing a little better and felt pretty good, although her blood pressure had been slightly going up. Dr. Frederick diagnosed asthma and hypertension. He encouraged her to stop smoking. He also gave her a prescription for Lortab for

26

"chronic neck pain."

On April 21, 2005, Plaintiff presented to Dr. Frederick for preadmission evaluation for her surgery on the parapharyngeal mass (R. 299). Her asthma was much better and she was doing fairly well. She was still smoking but "planning to quit in the beginning of May." Upon examination, Plaintiff's back had no tenderness on percussion. The ALJ held an Administrative Hearing on May 13, 2005 (R. 308).

The undersigned finds the above- cited evidence – the only evidence before the ALJ– supports the ALJ's determination that Plaintiff's complaints of her pain and limitation were not entirely credible. There is no record that Plaintiff ever informed a medical provider that she needed to lie down at all, much less three to four hours per day. No medical provider ever opined she was disabled or should not work before her date last insured, except for two weeks at about her onset date, when she was also diagnosed with bronchitis; and two weeks after she started back to work full-time at Subway, when her doctor "gave her an excuse to decrease her work to part-time to see if [it would] help a little bit," because Plaintiff "did not want to take any medications . . . ."

Plaintiff's providers continuously advised exercise for her back and neck muscles. Eight months after her onset date and seven months before her date last insured, Plaintiff told a physician she had more back pain whenever she did a lot of heavy work at home. Dr. Schunn advised only conservative management. In December, 2004, three months before Plaintiff's date last insured, Dr. Schunn advised only conservative measures– physical therapy, and if that did not help, only nonsteroidal anti-inflammatory drugs.

Plaintiff's straight leg raising was usually negative, her motor and sensory were usually within normal limits, and she generally had "some" tenderness of the spine.

27

Plaintiff herself testified as to whether she did the cooking and cleaning at home:

I do because I don't really have a choice. Dave and Craig help. They help out once in a while, when they're there, when I'm in a lot of pain. But I don't want them doing - - I've go to do it. I can't expect everyone around me to do everything for me.

Significantly, Plaintiff was admittedly working during this time, albeit only part-time. While Plaintiff correctly argues that her functional capacity should be determined based on her ability to perform work activities on a regular and consistent basis, that is, eight hours per day, five days per week, the undersigned finds Plaintiff's work is clearly part of her daily activities. Further, Plaintiff testified that that work entailed her standing most of the time, and that by the time she had worked four hours, she was in pain and getting shaky. If she "push[ed] it" to six hours, she had to "relax the rest of the day" so her husband and son "had to pitch in, do half of [her] work at home." Yet she testified that her boss would ask if she'd like to sit down for a couple of minutes or even lie down, but she would tell him no, that she was okay. In other words, by Plaintiff's own testimony, if she worked six hours in one day mostly standing, without taking a break to lie down or even sit, she could only do half her work at home afterward. The undersigned finds this ability totally inconsistent with a finding of disability from all work.

All of the above evidence substantially supports the ALJ's determination, based on the evidence before him, that Plaintiff could work at the light exertional level with a sit-stand option and no exposure to extremes of fumes, dusts, gases or other respiratory irritants.

In addition, the opinions of the two State agency reviewing physicians also support the ALJ's determination. In fact both opined that Plaintiff could work at the medium exertional level. 20 CFR § 404.1527(f)(2)(i) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

As part of her argument regarding credibility, Plaintiff particularly argues that the ALJ did not apply Social Security ruling ("SSR") 96-7p, as regards the type of medication she was taking and other measures she used for relief of pain, such as lying down three to four hours per day. The undersigned has already found that there is no support in the record before the ALJ for a requirement that Plaintiff lie down at all during the work day, especially for three to four hours per day.

Plaintiff at the hearing testified she was taking hydrocodone to relieve her pain (R. 311). Dr. Bonaroti's records indicate she was prescribed hydrocodone 5/500 every four to six hours. Again, there is no record of Plaintiff complaining to her doctors that her medications were causing any adverse side effects (except for Toprol for high blood pressure, which was discontinued without further comment). Further, although she may have been prescribed hydrocodone to take every four to six hours, Plaintiff testified she did not take it a lot because she was working at the pharmacy and it interfered with her concentration. Additionally, the undersigned notes that Dr. Schunn opined that Plaintiff should be treated conservatively, taking only non-steroidal anti-inflammatories if physical therapy did not work.[2]

_____

[2]Plaintiff states that hydrocodone is prescribed for moderate to moderately severe pain. This is a correct representation. PHYSICIANS DESK REFERENCE at 3315 (60th ed. 1006). Plaintiff was prescribed 5 milligrams hydrocodone every four to six hours. Lortab (brand name for Hydrocodone and acetaminophen) is prescribed in four strengths – 2.5, 5, 7.5, and 10 milligrams. Id. Every strength is prescribed at every four to six hours. Plaintiff was therefore prescribed a lower dose of the medication. It is recommended that no more than 8 per day be

In her Reply brief, Plaintiff argues: "Since the submission of Plaintiff's Motion for Summary Judgment, the Fourth Circuit has further clarified the credibility standard under *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996)." (Reply Brief at 1). Plaintiff cites Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006). In Hines, the Fourth Circuit stated that "[h]aving met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, Mr. Hines was entitled to rely exclusively on subjective evidence to prove the second part of the test, *i.e.*, that his pain is so continuous and/or severe that it prevents him from working a full eight hour day." Id. at 563. Plaintiff then argues that, relying on Hines, she is entitled to rely exclusively on her subjective evidence to prove that she is unable to work a full eight-hour day.

The undersigned finds Hines distinguishable from the case at bar. Mr. Hines' long-time treating physician had advised him to stop working due to his severe Sickle Cell Disease. The 17-year treating physician also opined in two separate reports that Mr. Hines was fully disabled by his impairment. The Fourth Circuit found "the ALJ improperly refused to credit Dr. Jeon's medical opinion that his long term patient (Mr. Hines) was totally disabled." Id. Here, no doctor opined that Plaintiff could not work. She was at one point given an off-work slip for two weeks only. Further, although the Fourth Circuit did state that Hines was entitled to rely exclusively on subjective evidence, it also noted that Hines' testimony was not inconsistent with his daily activities. The Fourth Circuit therefore found that the evidence of Mr. Hines' pain and limitation was undisputed.

The undersigned here finds there are inconsistencies between Plaintiff's alleged pain and limitations and other evidence in the record, aside from the objective evidence in that regard. As

_____

taken at the 5 milligram strength. Yet Plaintiff stated the most she ever took was four, and usually she did not take it at all. The undersigned therefore cannot find that the mere fact that Plaintiff was prescribed hydrocodone supports a finding that her pain was severe and limiting.

already noted, no doctor ever opined she could not work. As the ALJ found, she was treated conservatively. Plaintiff's own statements to her physicians are inconsistent with her testimony. She never mentioned a need to lie down three to four hours per day to any health care provider, and none ever suggested it. In fact, she consistently reported to her doctors that she was "doing fairly well." She told her boss she did not need to lie down or even sit, although he offered. She worked up to six hours in a day (albeit only two or three days per week), and still did half her work at home.

The undersigned therefore finds substantial evidence supports the ALJ's determination, based on the evidence of record before him, that Plaintiff's statements regarding her pain and limitations were not entirely credible.

The undersigned further finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled through the date of his decision, August 27, 2005.

### D. New Evidence Submitted to the Court

Plaintiff next argues that this matter should be remanded for the commissioner to consider new and material evidence pursuant to the sixth sentence of 42 U.S.C. §405(g). Defendant contends that the additional evidence submitted by Plaintiff to the Court did not address Plaintiff's condition during the relevant period and was therefore not material.

In Borders v. Heckler, 777, F.2d 954, the Fourth Circuit held:

A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Sims v. Harris,* 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. *King,*

31

599 F.2d at 599.

The undersigned finds Plaintiff has met the third and fourth factors. She could not have submitted the evidence to the ALJ because it was not in existence at the time the ALJ made his decision. Further, Plaintiff presented to this Court, not only a "general showing of the nature" of the new evidence, but the actual evidence itself. The sole remaining issue is therefore whether the evidence is material – that is, whether it relates back to the relevant time period, and whether the ALJ's decision might reasonably have been different if the new evidence had been before him. The undersigned believes Plaintiff's evidence does not meet either test.

Plaintiff's own memorandum states:

> On October 4, 2005, just five weeks after the Administrative Law Judge issued his decision, Mrs. Parry contacted Dr. Bonaroti, stating that she had to keep her right arm flexed to stop the pain. At her initial appointment, she complained of increased pain, numbness and tingling in the right upper extremity. She also had low back pain that occasionally went down the left posterior thigh/calf. She indicated that standing or sitting for long periods of time or being very active made her pain worse.

As Plaintiff argues, this report was made five weeks after the ALJ's decision. Significantly, however, this was also more than six months after Plaintiff's insured status expired. Further, while Plaintiff reported subjective pain, eight days later she reported the upper extremity pain, numbness tingling and weakness was better with prednisone. The next day, Plaintiff's own doctor's examination showed her motor strength was normal throughout, her tone was normal, her gait was normal, her sensation was decreased on the right C6 dermatone, reflexes were decreased, coordination was normal, straight leg raises were negative, and Patrick's sign was negative. Under "Diagnoses," the doctor checked "New Problem, No Workup." The doctor noted that the acute onset of right upper extremity pain and numbness developed about three weeks earlier, after the ALJ's

determination, and months after her date last insured. The MRI showed "protrusions on the right at C5-C6 and on the left at C5-C6 and C6-C7." The doctor found Plaintiff was "having worsening cervical radiculopathy due to cervical disc disease." However, shortly thereafter, Plaintiff reported her cervical complaints had subsided significantly and she now was complaining mostly of low back and leg pain. She did not want to consider surgical intervention for her neck.

The undersigned therefore finds Plaintiff's complaints regarding her cervical impairments are not relevant to the time the claim was before the ALJ. They also are not material, as they would not reasonably have changed the ALJ's decision in the matter.

The doctor did note that about six months after he had last seen Plaintiff she developed low back pain with radiation down the left leg and numbness, but she had no weakness, no bowel or bladder complaints, no gait disturbance, no motor or reflex deficits, and negative straight leg raising. The doctor reviewed a recent MRI which showed "a large L4-L5 disc herniation in the left with an extruded fragment." He found Plaintiff had chronic back and leg pain related to her lumbar disc herniation. Notably, however, Plaintiff's October 2002 MRI similarly showed:

> There is a large herniation of extrusion configuration at the L4-L5 disk level. This herniation extends into the midline and is slightly lateralized toward the right subarticular zone, but also causes substantial mass effect in the left subarticular zone. The extruded component extends into the suprapedicular L5 as well as infrapedicular L4 levels. There is moderate-to-severe central spinal canal compromise at this level, as well as some narrowing of the inferior foramina.

(R. 249).

In other words, the herniation noted by Dr. Bonaroti in October 2005, existed in October 2002. The main difference between October 2002 and October 2005 was Plaintiff's subjective complaint of lower back pain. Objectively, the L4-5 herniation was observed three years earlier.

At that time Plaintiff and her doctors opined it was asymptomatic and required nothing but conservative treatment. More than three years later, and eight months after her date last insured, Plaintiff's doctor stated: "Interestingly, her cervical complaints have subsided significantly and she now is complaining mostly of low back and leg pain." (Emphasis added). He then stated: "I think she would benefit from a L4-L5 laminectomy and discectomy . . . ." In January 2006, almost ten months after her insured status expired, Plaintiff underwent surgery.[3]

This new evidence indicates only that Plaintiff may have had worse lower back pain in October 2005, than she did in October 2002. Even in October 2005, however, her stated reason for her appointment with Dr. Bonaroti was "cervical." She only complained of low back pain that occasionally went down the left posterior thigh/calf at the time. She also indicated that standing or sitting for long periods of time or being very active made her pain worse. The ALJ never required Plaintiff to stand or sit for long periods of time. Further, Plaintiff's own complaint that "being very active" made her pain worse, is inconsistent with her argument that she is totally disabled from all work. The ALJ had limited her to work at the light or sedentary exertional level with a sit/stand option. He therefore did not require her to stand or sit for long periods of time or to be very active.

Plaintiff argues in her Reply brief that "if the new evidence creates a conflict, is contradictory or calls into doubt any decision grounded in the prior medical reports, the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence." Citing Myers v. Barnhart, 2005 W.L. 3434978 at 5 (W.D.Va. 2005). Plaintiff then argues that "the need for surgery on Mrs. Parry's lumbar spine is in conflict. Given this conflict in the medical evidence, this matter

---

[3]Unfortunately, the surgery was not entirely successful and Plaintiff underwent a second surgery a month later. After the second surgery, however, Plaintiff reported good results.

34

should be remanded to the commissioner to consider the new and material evidence." The undersigned first notes that <u>Myers</u>, an unpublished Western District of Virginia case, has little to no precedential value in this district. More importantly, however, <u>Myers</u> is distinguishable from the case at bar. In <u>Myers</u> the claimant's long-time treating physician submitted an RFC to the Appeals Council that was contradictory to the ALJ's RFC. Here Plaintiff has submitted the evidence to the Court, not the Appeals Council. There is no argument asserted that the Appeals Council erred. Additionally, in <u>Myers</u> the Magistrate Judge found:

> Dr. Bostic's prior treatment records repeatedly indicated plaintiff's compression fracture and disc degeneration are the sources of plaintiff's back pain . . . . Dr. Bostic treated the plaintiff for these maladies during the period before and up to the date of the ALJ's decision.

<u>Id.</u> at 6.

In the case at bar, Plaintiff did see Dr. Bonaroti only five weeks after the ALJ's decision, but this was more than five months after her date last insured. Significantly, Dr. Bonaroti had not seen Plaintiff in the three years prior to that date. Plaintiff stated the reason for the appointment in October 2005 was "cervical." In October 2005, she complained mostly about symptoms related to her cervical impairments. In December 2005, however, Dr. Bonaroti noted: "Interestingly, her cervical complaints have subsided significantly and she <u>now</u> is complaining mostly of low back and leg pain." (Emphasis added).

For all the above reasons, the undersigned finds the new evidence submitted by Plaintiff does not pertain to the relevant time frame and would not have reasonably changed the ALJ's determination. The undersigned therefore finds the evidence is not "material." The undersigned therefore recommends Plaintiff's Motion for Remand be **DENIED**.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 13] be **GRANTED**, Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand for Consideration of New and Material Evidence [Docket Entry 12] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *22* day of February 2007.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE